IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    vs.<br><br>TIMOTHY HARDIN,<br><br>       Defendant. | DOCKET NO. 5:18 CR 25 |

**SENTENCING MEMORANDUM**

## I.    Introduction

Despite being introduced to illegal drugs by his own mother while he was in middle school, and struggling with ongoing drug addiction as a result, Timothy Hardin has maintained stable relationships and worked productively throughout his life, spending nine years in the military ending with an honorable discharge before going on to a series of other jobs, including going into business with his wife. He and his wife had been together for 14 years at the time of his arrest, and have a 10-year old daughter they took care of and supported together until his arrest. His addiction issues are reflected in several misdemeanor convictions resulting in a criminal history category of II; his lone felony conviction, which occurred twenty-five years ago – consensual sex with a teenager when he was himself a teenager, an act which would have been, and would be today, perfectly legal in much of the United States and much of the world – resulted in a short term of probation and subsequent automatic expungement.

Nevertheless, the Probation Department claims – incorrectly, as detailed below – that that conviction mandates an increase in the mandatory minimum available sentence in this case from five years to fifteen years. Mr. Hardin presents no danger to any child and does not qualify for any such statutory enhancement.

The sentencing guidelines recommend a sentence for people who have committed same crime as Mr. Hardin with the same criminal history score as Mr. Hardin, but without the § 3C1.2 enhancement, of 108 to 135 months of imprisonment. However, nationwide, the majority of defendants like Mr. Hardin get below-guidelines sentences, and federal judges actually sentence the middle 50% of such people to between 72 and 108 months. Indeed, those numbers would be even lower but for the government's varying and erratic charging policies across the country, which allow some defendants to plead guilty without a mandatory minimum, while others must accept a mandatory minimum, with no discernible reason for the distinction. With so many people getting less time for the same crime, simply because prosecutors around the country allow pleas without mandatory minimums, a sentence at the true "low end" of the range of normal sentences for his crime and criminal history – 72 months –would be "sufficient, but not greater than necessary" to accomplish the purposes of 18 U.S.C. § 3553(a).

Since the guidelines recommendation of a lifetime of supervised release is the result of a drafting error, as the Sentencing Commission admits, the defense also asks for a term of five years of supervised release. The defense also objects to certain of the supervised release conditions automatically applied in this district in all "sex offense" cases – including non-contact child pornography offenses – as detailed below.

## II. PSR objection: Prior conviction under Tenn. Code Ann. § 39-13-506 (1994) does not relate to "aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor"

The PSR lists the statutory range of imprisonment as 15 to 40 years rather than the otherwise applicable 5 to 20 years "because the defendant has a qualifying prior conviction (Statutory Rape Case No. 11368 Carter County, TN)" citing 18 U.S.C. § 2252A(b)(1), which provides for the enhanced penalties if the defendant "has a prior conviction...under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor...." *Id.* However, statutory rape in Tennessee, as it existed in 1994 when Mr. Hardin, age 19, was convicted of that crime, was not such a law, and his conviction does not invoke the enhanced penalty under § 2252A(b)(1).

In *United States v. Darragh,* 3:12 CR 63 (W.D.N.C. Oct. 23, 2013) (Cogburn, J.), the defendant had a prior conviction under N.Y. Penal Law § 130.55 for Sexual Abuse in the Third Degree, which the presentence report used as a predicate for the statutory enhancement under § 2252A(b)(1). The New York statute in question set the age of consent at 17. *See* N.Y.P.L. § 130.55 (1994). The defense objected, and Judge Cogburn sustained the objection, finding that the 15-year mandatory minimum sentence did not apply. *Darragh,* Sentencing Transcript (doc. no. 39) at 21-22. The Tennessee statute under which Hardin was convicted is similarly not a law "relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor," and therefore does not trigger the enhanced penalty.

At the time of Mr. Hardin's prior conviction, the relevant code section – Tenn. Code Ann. § 39-13-506 (1994) – read as follows:

(a) Statutory rape is sexual penetration of a victim by the defendant or of the defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least four (4) years older than the victim.

(b) If the person accused of statutory rape is under eighteen (18) years of age, such a defendant shall be tried as a juvenile and shall not be transferred for trial as an adult.

(c) Statutory rape is a Class E felony.

Thus, the Tennessee statute at the time set the age of consent at 18.

In requesting that the Probation Department add the statutory enhancement in this case, the government tried to distinguish Judge Cogburn's decision in *Darraugh,* first on the ground that the age of consent was 17 years old in the statute at issue there, while it is 18 in the statute at issue here. *See* doc. no. 23 at 5. That makes Mr. Hardin's claim here stronger than that in *Darraugh,* not weaker.

The government then repeats Judge Cogburn's comments that it was a "close case" and that his decision involved the particular defendant, evidence, and statute before him and no other. *See id.* at 5 & n.1. Naturally, the decision of one District Judge does not bind another District Judge – even in the same District – but the government must admit that the logic and analysis of *Darraugh* would compel the same result in Mr. Hardin's case.

In *United States v. Rangel-Castaneda*, 709 F.3d 373, 380-81 (4th Cir. 2013), the Fourth Circuit examined a later version of the very the same statute at issue here. The Fourth Circuit held that the statute did not qualify as "sexual abuse of a minor" under USSG § 2L1.2 because the generic meaning of "minor" within the meaning of "sexual abuse of a minor" means someone under the age of 16, according to the majority of American jurisdictions, which set the age of consent at 16. The *Rangel-Castaneda* court also found that the Tennessee statute did not constitute either "statuory rape" or "forcible sex offense"

for the same reason. *Id.* at 378-80. While *Rangel-Castaneda* specifically involved the Sentencing Guidelines, the Fourth Circuit noted that the analysis would be the same under federal statutes using the same language, citing the identical holdings in cases interpreting "sexual abuse of a minor" in 8 U.S.C. § 1101(a)(43)(A). *See Rangel-Castaneda* at 381 (citing *Rivera–Cuartas v. Holder,* 605 F.3d 699, 702 (9th Cir. 2010) (Arizona statutory rape is not "sexual abuse of a minor"); *Estrada–Espinoza v. Mukasey,* 546 F.3d 1147, 1152–53 (9th Cir. 2008) (en banc) (California statutory rape is not "sexual abuse of a minor")).

In its earlier filing, the government attempted to distinguish the Fourth Circuit's decision in *Rangel-Casteneda, see* doc. no. 23 at 5, by repeating the following quote from the opinion:

> We do not attempt to establish a global definition of a "sexual abuse of a minor" offense. In other words, rather than set out what "sexual abuse of a minor" *can* mean, we simply note one particular thing that it *cannot* mean.

*Rangel-Casteneda,* 709 F.3d at 381. The "thing it *cannot* mean," however, is consensual sexual activity with a person under the age of 18, without more. That is exactly what was prohibited by the Tennessee statute at issue in both Mr. Hardin's case and in *Rangel-Casteneda*

In *Esquivel-Quintana v. Sessions*, 581 U.S. __, 137 S. Ct. 1562, 1567 (2017), the Supreme Court held that a conviction under a state statute criminalizing consensual sexual intercourse between a 21-year-old and a 17-year-old does not qualify as sexual abuse of a minor under the Immigration and Nationality Act (INA). Similar to *Rangel-Castaneda*, the Supreme Court recognized that "in the context of statutory rape offenses that criminalize sexual intercourse based solely on the age of the participants, the generic federal definition of sexual abuse of a minor requires that the victim be younger than 16." *Id.* at 1568.

Because the Tennessee statute under which Mr. Hardin was convicted sets the age of consent at 18, it is categorically overbroad. Under the analysis set forth in *Rangel-Castaneda* and *Esquivel-Quintana*, the Tennessee statutory rape statute does not categorically relate to sexual abuse or abusive sexual conduct because it covers private, consensual acts between a 21-year-old and a 17-year-old which cannot be considered "abuse" or "abusive."

In addressing *Esquivel-Quintana,* the government tries once again to distinguish binding authority by pointing to irrelevant differences in the cases. *See* doc. no. 23 at 6. A minor, for purposes of our case, is indeed someone under the age of 18, as the government writes. But consensual sexual activity is not per se "abusive," without more, simply because one of the participants is under the age of 18. That activity is what the Tennessee statute prohibited, and that is what the Supreme Court and the Courts of Appeals agree cannot be considered per se "abusive."

When Congress uses terms like "relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor" to trigger a sentencing enhancement, the courts must interpret those terms consistent with their "generic, contemporary meaning," rather than relying on the labels used in a particular state. *Taylor v. United States*, 495 U.S. 575, 598 (1990); *id* at 589 (reasoning that a uniform definition "protect[s] offenders from unfairness of having enhancement depend upon labels employed by the State statute of conviction"); *see also United States v. Diaz-Ibarra*, 522 F.3d 343, 348-49 (4th Cir. 2008) (applying *Taylor* categorical approach to define "sexual abuse of a minor"). Accordingly, the court must ask whether every conviction under Tenn. Code Ann. § 39-13-506 (1994) would qualify as "aggravated sexual abuse, sexual abuse, or abusive sexual conduct

involving a minor or ward."  In conducting this inquiry, the court "look[s] . . . 'only to the statutory definition of the state crime and the fact of conviction to determine whether the conduct criminalized by the statute, including the most innocent conduct, qualifies' as an offense 'relating to' the predicate offenses."  *United States v. Colson,* 683 F.3d 507, 510 (4th Cir. 2012) (quoting *Diaz-Ibarra,* 522 F.3d at 348); *see also United States v. Gomez,* 690 F.3d 194, 197-98 (4th Cir. 2012).

The Seventh Circuit has also held that the statutory enhancement for child pornography cases cannot be based on a statute similar to the one at issue here.  In *United States v. Osborne,* 551 F.3d 718 (7th Cir. 2009), the question was whether § 2252(b)'s enhanced, 15-year mandatory minimum applied based on a prior conviction under an Indiana law that prohibited, among other things, consensual sex between an 18-year-old and a 15-year-old.  *Id.* at 719.  The government argued "that § 2252(b)(1) must be read 'broadly' and that any offense arising from sexual conduct with minors must be seen as 'abusive.'"  *Id.*  The Court of Appeals rejected the latter part of that argument as a matter of statutory interpretation because it "would read the word 'abusive' out of § 2252(b)(1)."  *Id.* The government's approach, in other words, treated the statute as if it applied based on "any conviction 'for sexual conduct involving a minor or ward.'"  *Id.*  But, as the court explained, Congress chose a more limited formulation by applying the enhanced minimums based only on the "subset" of convictions for "sexual conduct involving a minor" that also include "abusive" conduct. *Id.*

The Court of Appeals next turned to the task of defining "abusive" as used in § 2252. The court observed that while § 2252 does not define the term, "some other sections shed

light on how Congress understood the word." *Id.* at 720 (citing 18 U.S.C. §§ 2241, 2242, 2243).  As a result, the court concluded:

> Given the lack of a definition in § 2252, we think it best to say that, as a matter of federal law, sexual behavior is "abusive" only if it is similar to one of the crimes denominated as a form of "abuse" elsewhere in Title 18.

*Id.* at 721. In doing so, the court observed that § 2243 "is most helpful for our purpose, as it covers the sexual abuse of minor," which is defined as "'engag[ing] in a sexual act' with a person between the ages of 12 and 15 who is at least 4 years younger than the defendant." Id. at 720. Based on these observations about the meaning of "abusive," the Court of Appeals reviewed the Indiana offense and concluded that it did not categorically trigger § 2252's enhanced minimums.

In this case, the government argued in its defense of the statutory enhancement that the language "relating to" in the statute somehow broadens the statute to include sexual conduct with anyone under the age of 18 whether or not it was "abusive." *See* doc. no. 23 at 3.  This vague and insubstantial argument is the same argument specifically rejected by the Seventh Circuit in *Osborne,* as noted above, as it would write the word "abusive" out of the statute.

The government may also argue for the use of the modified categorical approach to Mr. Hardin's prior conviction to answer the charge of overbreadth, an approach used in certain cases to determine whether the defendant committed an offense that would justify the enhancement. *Shepard,* 544 U.S. 13 (2005).  However, the modified categorical approach "applies to only 'a narrow range of cases' – those involving statutes encapsulating separate proscriptions, at least one of which" categorically qualifies for the statutory enhancement. *United States v. Gomez,* 690 F.3d 194, 198 (4th Cir. 2012) (quoting *Taylor,*

495 U.S. at 602). Under the modified categorical approach the district court "may examine a limited universe of documents relevant to the underlying conviction" – such as charging documents, plea agreements, and plea-colloquy transcripts – "for the sole purpose of determining which part of the statute the defendant violated." *Id.* at 198. Here, the Tennessee statute as it existed in 1994 was not divisible into separate categories of conduct, some of which would categorically trigger the § 2252A enhancements, so the modified categorical approach may not be used.

The government also argues for a broader interpretation of § 2252A(b)(1) based on *United States v. Colson,* 683 F.3d 507 (2012), which found that a prior Virginia conviction for production of child pornography qualified as a sentencing predicate under § 2252A(b)(1) even though the pornography could have depicted someone between the ages of 16 and 18. *See* doc. no. 23. But consent to private sexual activity generally and being old enough to be legally depicted in pornographic materials are obviously two very different things, and the defense in *Colson* made no attempt to argue that any national consensus allows 17-year-olds to be filmed performing sexual acts.

The Tennessee statute under which Mr. Hardin was convicted criminalized consensual acts involving people up to the age of 18 and those just over four years older. Such a statute does not involve the "misuse or maltreatment" of the victim and therefore does not qualify as "abuse" or "abusive," since, as acknowledged by the Fourth Circuit in *Rangel-Casteneda* (reversing Judge Reidinger) and by Judge Cogburn in *Darragh,* the generic contemporary understanding of "minor" in these circumstances means someone under the age of 16.

To be clear, the government, in the end, argues simply that any crime involving sexual activity with someone under the age of 18 is "abusive" and therefore qualifies as a predicate. In its own words: "Because Defendant was convicted of a sexual crime against a minor under the age of 18, it is not overbroad." Doc. no. 23 at 7. That position has been rejected by the Supreme Court, the Fourth Circuit, other circuit courts, and Judge Cogburn, and has been specifically rejected regarding the very same statute. Accordingly, Mr. Hardin's prior conviction is not a predicate under § 2252A(b)(1), and his statutory range is five to twenty years.

## III. PSR objection: Image depicting digital penetration does not per se "portray sadistic conduct" and is not a per se "depiction of violence"

The draft presentence report did not include an enhancement under USSG § 2G2.2(b)(4)(A), which increases the offense by four levels if it "involved material that portrays sadistic or masochistic conduct or other depictions of violence." The government objected, saying that the enhancement should apply, *see* doc. no. 25, and the Probation Department changed course and included the enhancement in the final PSR, giving no reason for the decision. *See* doc. no. 26 at 21. The draft PSR was correct in omitting the enhancement.

The image at issue depicted digital penetration of a prepubescent minor. Doc. no. 25 at 1. The government primarily cites *United States v. Burgess,* 684 F.3d 445, 454 (4th Cir. 2012) in support of idea that "[t]his type of penetration of a prepubescent minor is a depiction of sadism and violence." The government's analogy to *Burgess* is false and misleading. The actual language of *Burgess* is worth reviewing:

During trial, the government introduced a video recording in Burgess' possession of a five-year-old child engaged in vaginal intercourse with an adult male…. Given that the vaginal penetration of a five-year-old girl by an aroused adult male would necessarily cause physical pain to the victim, we conclude, as did the district court, that Burgess' possession of this video recording qualified for a sentencing enhancement under U.S.S.G. § 2G2.2(b)(4).

*Burgess,* 684 F.3d at 454 (citation omitted).

Penetration by a finger is not the same as "vaginal intercourse" with "an aroused adult male," and would not necessarily cause physical pain. Indeed, each and every case cited by the government involved sexual intercourse between a prepubescent child and an adult male, i.e. penile penetration of the vagina or anus; although some of the opinions may have euphemistically discussed "sexual penetration… by an adult male," none involved digital penetration.

The § 2G2.2(b)(4)(A) enhancement is meant to differentiate between images of child pornography generally and those few that add the infliction of pain for the depraved interest of the viewer – so-called "hurt-core" pornography. There is no indication that this was such an image, or even that the child would have felt any immediate physical pain from the act. Accordingly, the § 2G2.2(b)(4)(A) enhancement does not apply.

## IV. PSR objection: Attempting suicide is not "fleeing from a law enforcement officer"

The PSR includes a two-level enhancement for "recklessly creat[ing] a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer," § 3C1.2, because Mr. Hardin indicated while being questioned that he might kill himself, pulled out a gun, and held it to his own head before being wrestled down and disarmed by officers.

As the Boone Police Department wrote in a news release, provided by the government in discovery:

> [Mr. Hardin] started to make statements indicative of an intent to harm himself. The investigators determined it was best if they took the subject into emergency protective custody. As they attempted to do this, the subject produced a handgun and attempted to harm himself. The subject had to be forcible subdued to prevent him from harming himself. The subject suffered a laceration to the head and was transported to the Watauga Medical Center Emergency Department for treatment and to be evaluated for the Involuntary Commitment Order. Thankfully the officers sustained only minor scrapes and scratches during this incident.

First of all, and most importantly, the enhancement only applies "in the course of *fleeing* from a law enforcement officer." (emphasis supplied) Mr. Hardin was not "fleeing" from anyone, except perhaps in the metaphorical since of trying to "flee" from justice by committing suicide. The Sentencing Guidelines do not operate metaphorically. No reported case has ever held that a suicide attempt, without more, constitutes "flight." However, the Seventh Circuit has held, analogously, that a suicide attempt the day before a guilty plea hearing does not constitute obstruction of justice, and that a District Judge's "finding that [the defendant] acted willfully and with the specific intent not to be present in court as ordered...and that he had the intent to impede the prosecution of his case" was "clearly erroneous." *United States v. Hanhardt,* 361 F.3d 382, 388 (7th Cir. 2005) *vacated on other grounds sub nom Altobello v. United States,* 543 U.S. 1097 (2005) (remand in light of *United States v. Booker,* 543 U.S. 220 (2005)) The *Hanhardt* court noted that escape is different from suicide, even though both involve avoiding prosecution, *see id.* at 388-89, and that attempting suicide cannot be considered obstruction of justice. *Id.* at 389. Just as attempting suicide is not the same as "intend[ing] not to be present in court," nor is it the same as intending to "flee."

The government selectively and misleadingly quotes the application notes to § 3C1.2 to suggest that any such conduct in the course of resisting arrest satisfies the "flight" requirement. The full quote is worth reviewing:

> *'During flight'* is to be construed broadly and **includes preparation for flight. Therefore,** this adjustment also is applicable where the conduct occurs in the course of resisting arrest.

USSG § 3C1.2 comment. (n.3) (second emphasis supplied). This is because resisting arrest, as the term is commonly used, is necessarily the first action in an attempt to escape. The guideline could easily have been written to apply to any reckless endangerment during the preparation, commission, or flight after the offense, or could have said "during flight or resisting arrest." It was not, and the government's suggestion would read the "flight" requirement out of the guideline.

Moreover, the government's reading would use the commentary to expand rather than explain the text of the guideline, which is impermissible. If an application note is inconsistent with a guideline, the guideline controls. *Stinson v. United States*, 508 U.S. 36, 43 (1993); *see also United States v. Winstead*, 890 F.3d 1082, 1090-92 (D.C. Cir. 2018) (expansion of USSG § 4B1.2 to include attempt crimes through application note is plainly inconsistent with guideline text, so attempt crime cannot not qualify for enhancement); *United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (en banc) (same). The Guidelines' "commentary 'should be treated as an agency's interpretation of its own legislative rule.'" *Winstead*, 890 F.3d at 1090 (quoting *Stinson v. United States*, 508 U.S. 36, 44-45 (1993)). This means that commentary may interpret only "genuinely" ambiguous guidelines, and any such interpretation "must fall within the bounds of reasonable interpretation." *Kisor v. Wilkie*, 588 U.S. __, 139 S. Ct. 2400, 2414-15 (2019). A court must "employ[ ] all of its

interpretive tools" before concluding that genuine ambiguity remains. *Id.* at 2416. And, "courts should not give deference to an agency's reading, except to the extent it has the power to persuade." *Id.* (internal quotations and citation omitted). The Sentencing Commission's judgment, embodied in its interpretative commentary, "must in some way implicate its substantive expertise" and its reading of the Guideline "must reflect fair and considered judgment" to be entitled to deference. *Id.* at 2417 (internal quotations and citation omitted). To the extent that the commentary purports to expand the reach of § 3C1.2 as the government suggests, i.e. to include reckless endangerment during resisting arrest which does not amount to flight, that commentary must be disregarded.

Second, whatever Mr. Hardin might have been thinking at one moment or another, he never pointed the gun at anyone but himself. His subsequent statement that he was planning to commit "suicide by cop" apparently referred to a fleeting thought not acted upon, since he did not in fact point the gun at any law enforcement officer. § 3C1.2 punishes actions, not fleeting ideas that do not come to fruition. *See United States v. Bell,* 953 F.2d 6, 10 (1st Cir. 1992) ("[s]ection 3C1.2 punishes the act of creating a risk of death, not merely the intent to create such a risk"). Indeed, in an analogous situation involving a knife, even an attempt to threaten police with a knife to induce them to shoot does not give rise to the § 3C1.2 enhancement, since that "is not the same thing as trying to attack the officers with a knife while fleeing." *United States v. Bush,* 2012 WL 394572, *11 (D.N.M. Jan. 23, 2012) (unpublished).

Moreover, the risk Mr. Hardin created that he himself might suffer harm cannot be the basis of the enhancement. *See* § 3C1.2 comment. (n.4) ("another person" excludes "a participant in the offense").

Finally, the principal purpose of the enhancement is to discourage persons trying to evade capture from reckless actions to escape custody. People confronted by law enforcement officers trying to effect their arrest may be motivated to try to escape, and the point of the enhancement is to "promote respect for the law" and "to afford adequate deterrence to criminal conduct." 18 U.S.C. 3553(a)(2)(A & B). Punishing a person who suffers from depression and despair serious enough for them to attempt or contemplate taking their own life does not advance either goal; indeed, a law punishing mental illness lessens respect for the law. "The nature of suicide does not lend itself to a clear understanding of an individual's motivation other than the obvious intent to end his life." *Hanhardt,* 361 F.3d at 389. For all these reasons, this Court should strike the two-level enhancement under § 3C1.2.

**V.  18 U.S.C. § 3553(a)(6): "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"**

Under 18 U.S.C. § 3553(a)(6), when deciding on a sentence, the sentencing judge must consider, *inter alia*, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." This is the principal function of the sentencing guidelines – to let a judge know, when deciding on a sentence for a particular defendant, what the typical sentence is, nationwide, for a typical defendant with the same criminal history who commits the same offense with the same characteristics.

The problem is that The United States Sentencing Commission essentially "keeps two sets of books." The Federal Sentencing Guidelines Manual is used to calculate a

recommended sentencing range in every case – a range that is supposed to describe a "sufficient, but not greater than necessary" sentence under 18 U.S.C. § 3553(a) in a typical case. That range is the same for all defendants with similar criminal histories who committed similar crimes. On the other hand, the Sentencing Commission keeps detailed data about every person sentenced in federal court, including, *inter alia*, the offenses of conviction, the guideline calculations including enhancements and reductions, and the sentence the District Judge ultimately imposed after considering the guidelines.

For the last six years of available data – from FY 2012 through FY 2017[1] – looking at defendants like Mr. Hardin (apart from the § 3C1.2 enhancement, as noted above) subject to the 108-135 month range,[2] **58% (11 out of 19) received below-guidelines sentences,** not even counting those who received departures under § 5K1.1. Another five received low-end sentences, leaving only 3 of 19 – 16 % -- who received sentences within the guideline range above the low end. There were no upward departures or variances. Accordingly, the median sentence was 87 months – a downward departure/variance of 20% -- and the 25th and 75th percentile received sentences of 72 and 108 months

---

[1]  The Sentencing Commission's data files are publicly available at https://www.ussc.gov/research/datafiles/commission-datafiles. This memorandum incorporates that data, which has been converted into spreadsheet form, selected for the relevant variables, and printed and attached hereto. The first spreadsheet shows all defendants with the same base offense level, enhancements, and reductions included in Mr. Hardin's draft PSR, omitting only the § 3C1.2 enhancement, since no one with his guidelines calculations and criminal history category has even received the § 3C1.2 enhancement. Indeed, out of the nearly 10,000 defendants sentenced under the child pornography possession/receiving/distribution guidelines – § 2G2.2 – over the six years for which data is available, only a single defendant received the § 3C1.2 enhancement. The data for that lone defendant is included as the second spreadsheet; that lone defendant had a guideline range of 235-293 months capped at 240 months, and received a sentence well below the low end of the guideline range.

[2] In the event that this Court finds that the 180-month mandatory minimum applies, Mr. Hardin's guidelines-recommended sentence will be the mandatory minimum. For reference, the defense has attached a spreadsheet (the fourth and final attachment) of the sentences over the six relevant years of all similarly situated defendants (same CHC and guidelines calculations) subject to that same mandatory minimum. All six such defendants received sentences of 180 months; there were no upward departures or variances.

respectively. In other words, the middle 50% of sentences – the true range of "normal" sentences for this type of crime and defendant – was between 72 and 108 months.

It therefore clear that federal judges across the country believe that the sentencing guidelines ranges for people like Mr. Hardin are too high, and those judges routinely give sentences well below those guidelines ranges. Amazingly, the Sentencing Commission agrees. In its 2012 report to Congress on child pornography sentences, the Commission said so in no uncertain terms. *See* U.S. Sentencing Comm'n, *2012 Report To The Congress: Federal Child Pornography Offenses.*[3]

> [A]s a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability.

U.S. Sentencing Comm'n, *2012 Report To The Congress: Federal Child Pornography Offenses,* Executive Summary (hereinafter "Executive Summary") at ii.[4] As an example,

> four of the of six sentencing enhancements in §2G2.2 — those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels — now apply to most offenders and, thus, fail to differentiate among offenders in terms of their culpability. These enhancements originally were promulgated in an earlier technological era, when such factors better served to distinguish among offenders.

Executive Summary at iii (footnote omitted). The numbers are stark:

> In fiscal year 2010, §2G2.2(b)(2) (images depicting pre-pubescent minors) applied in 96.1 percent of cases; §2G2.2(b)(4) (sado-masochistic images) applied in 74.2 percent of cases; §2G2.2(b)(6) (use of a computer) applied in 96.2 percent of cases; and §2G2.2(b)(7) (images table) applied in 96.9 percent of cases. Thus, sentencing enhancements that originally were intended to

---

[3] Available at https://www.ussc.gov/sites/default/files/pdf/news/ congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf.
[4] Available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Executive_Summary.pdf.

provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders.

Executive Summary at xi (footnote omitted; emphasis added).

With no appropriate changes in sight for the guidelines themselves, federal judges and prosecutors across the country have taken matters into their own hands.

Increasing numbers of courts and parties in non-production cases have engaged in charging and sentencing practices that have had the effect of limiting the sentencing exposure for many offenders as a result of the view that the current non-production sentencing scheme is outmoded, fails to distinguish adequately among offenders based on their levels of culpability and dangerousness, and is overly severe in some cases.

Executive Summary at xii. Judges and prosecutors are lessening the unjustifiable harshness of the guidelines for people like Mr. Hardin by allowing pleas to simple possession, stipulating away enhancements, agreeing to downward departures and/or variances, or by judges simply departing or varying without the government's agreement.

The Commission's special research project of fiscal year 2010 § 2G2.2 cases revealed four common practices used to limit non-production offenders' sentencing exposure: (1) charging practices that permitted offenders to be convicted only of simple possession despite having committed R/T/D [receipt/transportation/distribution] offenses (46.6% of cases); (2) plea agreements containing guideline stipulations regarding sentencing enhancements that limited offenders' sentencing exposure under the guidelines (11.4% of cases); (3) government sponsored downward departures and variances for reasons other than for an offender's substantial assistance to the authorities (10.3% of cases); and (4) non-government sponsored downward departures and variances (44.3% of cases). In fiscal year 2010, approximately four out of five (78.8%) § 2G2.2 offenders benefited from one or more of the above-mentioned four practices.

Executive Summary at xii.

In this district, the government routinely speculates that offenders in other districts may simply be less culpable for reasons not captured by the guidelines, and that judges

here should assume that individual factors under § 3553(a) in any particular case weigh in favor of a guideline sentence. The Sentencing Commission disagrees. The only differences between this district and others is how the government charges the cases.

> The Commission's analysis also showed that no offender or offense characteristics (e.g., an offender's military service record, history of criminal sexually dangerous behavior, or distribution of child pornography) appeared to account for these practices in most cases. Rather, **geographical differences in charging, plea bargaining, and sentencing practices among the 94 districts appear to be the strongest factor** explaining whether an offender benefitted from one or more of these practices.

Executive Summary at xii-xiii (footnotes omitted; emphasis added). This is exactly the kind of disparity that § 3553(a)(6) sought to end.

Roughly half of people like Mr. Hardin around the country are allowed to plead guilty to possession only, exempting them from any mandatory minimum. The prosecutor's contrary choice requiring Mr. Hardin accept a plea to receiving makes an enormous difference that cannot be justified by law, policy, or common sense:

> The Commission's special coding project of fiscal year 2010 cases revealed that slightly over half of §2G2.2 offenders were convicted solely of possession, which subjected them to no statutory mandatory minimum sentence and a statutory maximum sentence of ten years (assuming they had no predicate conviction for a sex offense). According to their PSRs and/or plea agreements, however, well over 90 percent of these offenders committed one or more R/T/D offenses. Had these offenders been convicted of an R/T/D offense, they would have been subject to significantly higher statutory penalty ranges as well as a higher base offense level under §2G2.2 than offenders convicted only of possession.

Executive Summary at xiii (footnote omitted).

The sentencing guidelines are supposed to treat similar offenders similarly and are supposed to provide guidance to judges based on the facts, not changed based on how an individual prosecutor charges the case and what sort of plea bargain he or she decides to

offer. Instead, the prosecutor's choices make literally years of difference in what happens to similar defendants in different districts:

> On average, offenders convicted of possession but who knowingly received child pornography were sentenced to a term of 52 months of imprisonment, while on average similarly situated offenders convicted of receipt were sentenced to a term of 81 months of imprisonment. On average, offenders convicted of possession but who distributed child pornography in exchange for other child pornography received a sentence of 78 months, while similarly situated offenders convicted of distribution received an average sentence of 132 months.

Executive Summary at xiii.

In Mr. Hardin's case, the difference is stark. Had he been allowed to plead guilty to mere possession of child pornography, as is common in other districts, his guideline range (absent the § 3C1.2 enhancement) would have been 87 to 108 months. But more importantly, the median sentence nationwide would have been 60 months, with the middle 50% receiving sentences of between 48 and 87 months.[5] Again, 73 % of defendants received a below-guidelines sentences, and not a single one of those 52 defendants received an upward departure or variance.

There is a better way, and the Sentencing Commission shows what it can be. Instead of using outmoded and inaccurate gauges of culpability and dangerousness resulting in irrational and unfair sentences, the Commission itself puts forth what judges should actually consider:

> As reflected in the report, the Commission believes that the following three categories of offender behavior encompass the primary factors that should be considered in imposing sentences in §2G2.2 cases:

---

[5] The third spreadsheet attached hereto lists cases like Mr. Hardin's (absent the § 3C1.2 enhancement) involving a guilty to possession only.

(i)     the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the age of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technologies);

(ii)     the degree of an offender's involvement with other offenders — in particular, in an Internet "community" devoted to child pornography and child sexual exploitation; and

(iii)     whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.

The current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness. As a result, penalty ranges are too severe for some offenders and too lenient for other offenders. The guideline thus should be revised to more fully account for these three factors and thereby provide for more proportionate punishments.

Executive Summary at xvii-xviii.

The Sentencing Commission believes that the mandatory minimums for non-production child pornography offenses are simply too high, *see* Executive Summary at xx, and believes that the punishment for possession and receipt should be the same. *Id.* Even with the excessive mandatory minimum in place, however, charging disparities mean that federal judges actually sentence the middle 50% of people with the same guidelines calculations as Mr. Hardin, absent the § 3C1.2 enhancement, to 72 to 108 months, or to 48 to 87 months if they were allowed to plead to simple possession, as noted above.

Mr. Hardin should not be subject to greater punishment than "defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), simply because of the district in which he is being prosecuted. Nationwide, someone like him –a military veteran with a stable family and work history, who has struggled with substance

abuse while making efforts to seek and engage in treatment, whose drug abuse began at the

hands of his mother when he was too young to know better childhood trauma and abuse,

who presents no danger to anyone – could reasonably expect to receive a sentence of five

years in prison or less.  Even including the § 3C1.2 enhancement, under these unusual and

remarkable circumstances, anything more than 72 months would be "greater than

necessary" under § 3553(a).  This Court should therefore sentence him to 72 months of

incarceration.


## VI.    Supervised release term

The guidelines recommend the imposition of supervised release for life in any and

all child pornography cases, since they are "sex offenses."  *See* USSG § 5D1.2(b) & comment.

(n.1(A)(ii)) (all offenses under Chapter 110 "perpetrated against a minor" other than

recordkeeping offenses).

Amazingly, the Sentencing Commission itself admits that this was never its intent:

> The recommendation in §5D1.2(b) [for the maximum possible term of
> supervised release] was made before the enactment of the PROTECT Act of
> 2003, which raised the statutory maximum term of supervision from three
> years for most child pornography offenders to a lifetime term for all child
> pornography offenders. The Commission is considering amending the
> guideline in a manner that provides guidance to judges to impose a term of
> supervised release within the statutory range of five years to a lifetime term
> that is tailored to individual offender's risk and corresponding need for
> supervision.

Executive Summary at xix (footnote omitted).  The Commission's failure to act since the

report was issued in 2012 does not mean that this Court must compound the Commission's

mistake with blind obedience.  Since Mr. Hardin is among the least culpable of child

pornography offenders and presents the lowest risk of committing a future offense – and will be a registered sex offender for life in any event – he logically should be subject to the minimum term of supervision, not the maximum. This Court should therefore include a term of supervised release of five years.

**VII.     Supervised release conditions**

The defense hereby objects to imposition of the following special conditions mandated for every "sex offender" pursuant to Miscellaneous Order 3:16 MC 221, including defendants in child pornography cases, regardless of the characteristics of the individual case and defendant.

> *a.     Standard Sex Offender Condition #7 (contact with children)*

This condition violates 18 U.S.C. § 3583(d). Mr. Hardin's only prior "sex offense" was a consensual act with a teenager when he was himself a teenager 25 years ago. He does not pose a danger of committing a contact offense against a child. *See United States v. Worley,* 685 F.3d 404, 408 (4th Cir. 2012) ("conditions that interfere with a defendant's constitutional liberties, such as raising his child or associating with a loved one, must be adequately explained or else their imposition undermines the fairness and integrity of our judicial proceedings.") (citing *United States v. Davis,* 452 F.3d 991, 995–96 (8th Cir. 2006)) . This condition is not reasonably related to the pertinent § 3553(a) factors in this case, and the Court should at the very least explain why it is necessary.

b.      *Standard Sex Offender Condition #8 (loitering):*

This condition fails to satisfy the requirements of 18 U.S.C. § 3583(d). Nothing in the record suggests that Mr. Hardin has ever engaged in loitering or has sought out locations where children may be present.  Indeed, this crime was committed entirely online.  This condition is not reasonably related to the pertinent § 3553(a) factors in this case and involves a deprivation of liberty greater than necessary. Furthermore, this condition affects Mr. Hardin's constitutional right to loiter, which presents an additional reason why its necessity must be explained. *See City of Chicago v. Morales,* 527 U.S. 41, 53 (1999) ("the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause").

This condition is also unconstitutionally vague. The condition doesn't give a definition for "loiter." The dictionary definition of "loiter" is "stand or wait around idly or without apparent purpose." New Oxford American Dictionary 1028 (3d ed. 2010). The Supreme Court has held an anti-loitering ordinance to be unconstitutionally vague, stating: "[i]t is difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an 'apparent purpose.'" *Morales*, 527 U.S. at 56-57. Further, the term "loiter," as it is commonly understood, provides the probation officer with "absolute discretion . . . to decide what activities constitute loitering." Id. at 61 (internal quotation marks omitted). "The 'no apparent purpose' standard for making that decision is inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene." *Id*. at 62. Under *City of Chicago v. Morales,* this condition is unconstitutionally vague.

Further, the requirement that Mr. Hardin not "loiter" within 100 feet of "other places" that can "reasonably be expected to be used by children" compounds the vagueness of the term "loiter" by extending the restriction to virtually any location where Mr. Hardin might conduct his daily affairs, such as restaurants, shopping centers, grocery stores, banks, convenience stores, and highway rest stops. So in addition to banning "loitering," a term which vests the probation officer with absolute discretion, the condition also makes the restriction applicable to almost any location where Mr. Hardin possibly could go outside his home. This condition is unconstitutionally vague.

c.    *Sex Offender Conditions #9 & 13 (electronic device and internet restrictions)*

Mr. Hardin objects to Special Condition 9, which prohibits him from "us[ing], purchas[ing], possess[ing], procur[ing], or otherwise obtain[ing] any computer (as defined in 18 U.S.C. § 1030(e)(1)) or electronic device that can be linked to any computer networks, bulletin boards, internet, internet service providers, or exchange formats involving computers unless approved by the U.S. Probation Officer," and to Special Condition 13, which prohibits him/her from having any social media networking accounts without the approval of his/her Probation Officer. These conditions infringe on Mr. Hardin's constitutionally protected free speech rights, *see Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), and they deprive him of more liberty "than is reasonably necessary" to deter crime, protect the public, and rehabilitate him, 18 U.S.C. § 3583(d)(2).

Conditions of supervised release may not restrict more liberty than reasonably necessary, including constitutional liberty. *See id.* Section 3583's tailoring requirement reflects constitutional concerns, and "[c]onditions that restrict fundamental rights must be

narrowly tailored and directly related to deterring the defendant and protecting the public." *United States v. Holena*, 906 F.3d 288, 292 (3d Cir. 2018) (internal quotations and alterations omitted). A condition of supervised release "is not narrowly tailored if it restricts First Amendment freedoms without any resulting benefit to public safety." *Id.* (internal quotation omitted).

In *Packingham*, the Supreme Court struck down a North Carolina statute that prohibited convicted sex offenders – including those no longer on probation, parole, or supervised release – from accessing social media sites on the Internet. The Court held the statute unconstitutional, on its face, because its broad scope was "unprecedented in the scope of First Amendment speech it burdens" and the law was not "narrowly tailored to serve a significant governmental interest." *Packingham*, 137 S. Ct. at 1736, 1737.

When imposing conditions of supervised release, "given the integral role that computers and the Internet play in nearly every facet of modern-day life—a point driven home by the Supreme Court in *Packingham*—the Court must be careful not to impose a greater deprivation of liberty than is necessary." *United States v. Maxson*, 281 F. Supp. 3d 594, 599 (D. Md. 2017) (citing *Packingham*, 137 S. Ct. at 1735 (noting that the Internet is "the most important place[ ] (in a spatial sense) for the exchange of views"); *United States v. LaCoste*, 821 F.3d 1187, 1191 (9th Cir. 2016) ("Use of the Internet is vital for a wide range of routine activities in today's world . . . .  Cutting off all access to the Internet constrains a defendant's freedom in ways that make it difficult to participate fully in society and the economy.")).

Special Conditions 9 and 13 essentially restrict Mr. Hardin from all access to the internet or social networking sites, and "with one broad stroke bar[] access to what for

many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 137 S. Ct. at 1737. The conditions ban an array of constitutionally protected free speech activity. Further, the wide sweep of the conditions "precludes access to a large number of websites that are most unlikely to facilitate the commission of a sex crime against a child." *Id.* at 1741 (Alito, J., concurring). Although a district court can appropriately tailor conditions of supervised release, "[u]nder *Packingham*, blanket internet restrictions will rarely be tailored enough to pass constitutional muster." *Holena*, 906 F.3d at 295.

In tailoring conditions of release, moreover, "the fact that Defendant may use the Internet if he obtains prior written approval from his probation officer cannot salvage this otherwise overly broad restriction." *Maxson*, 281 F. Supp. 3d at 600. In other words, "a district court may not shift to the probation office its responsibility to ensure that a supervised release condition is consistent with the goals of sentencing." *Id.* (citing *LaCoste*, 821 F.3d at 1192 ("[i]f a total ban on Internet use is improper but a more narrowly tailored restriction would be justified, the solution is to have the district court itself fashion the terms of that narrower restriction. Imposing a total ban and transferring open-ended discretion to the probation officer to authorize needed exceptions is not a permissible alternative"); *United States v. Ramos*, 763 F.3d 45, 61 (1st Cir. 2014) ("[t]his authority of probation or a future court to modify a sweeping ban on computer or internet use does not immunize the ban from an inquiry that evaluates the justification for the ban in the first instance")).

Absent specific factual findings, "the court may not prevent [Mr. Hardin] from doing everyday tasks that have migrated to the internet, like shopping, or searching for jobs or housing. The same is true for his use of websites conveying essential information, like news, maps, traffic, or weather." *Holena*, 906 F.3d at 294. Rather than delegating all approval authority to the probation officer, the court must provide some categories of websites or at least a guiding principle. *Id.* at 293. For example, there is "no justification" for stopping Mr. Hardin "from accessing websites where he will probably never encounter a child, like Google Maps or Amazon," or websites where he "cannot interact with others or view explicit materials, like Dictionary.com or this Court's website." *Id.* In addition, the Court "should also consider the availability and efficacy of filtering and monitoring software," on both computers and cell phones, as an alternative to an outright ban. *Id.* at 294.

Considering the availability of narrowly-tailored conditions to ensure appropriate oversight and monitoring, it is simply unnecessary to require Mr. Hardin to obtain approval from a probation officer before using Internet-capable devices. *Maxson*, 281 F. Supp. at 600–01. Mr. Hardin therefore objects to Special Conditions 9 and 13 because they infringe on constitutionally protected rights and involve a greater deprivation of liberty than is reasonably necessary to provide deterrence and to protect the public from future crimes.

d. *Sex Offender Condition #14 (children's items)*

This condition violates 18 U.S.C. § 3583(d). *See United States v. Helton,* 782 F.3d 148, 157 (4th Cir. 2015) (J. Gregory concurring) ("it can be unreasonable for a twenty-one year old with no prior criminal convictions . . . to have to ask his probation officer for permission

to purchase a toy when, some great day later in his lifetime of supervision by the government, he becomes a grandparent.").

This condition is also unconstitutionally vague in that this condition fails to give Mr. Hardin sufficient notice of what conduct is specifically prohibited. This condition could be interpreted to restrict a broad array of common items that both children and adults routinely possess. It is ambiguous whether this condition restricts possession of board games like Monopoly and Life, video game consoles, comic books, Star Wars collectibles, or other items— not limited to in the condition—that the probation officer, in her discretion, might decide are appealing to children. Accordingly, the condition is unconstitutionally vague.

e.     *Sex Offender Condition #15 (Employment)*

This condition would violate 18 U.S.C. § 3583(d).  As noted above, there is nothing in the record to suggest that Mr. Hardin poses a danger of committing a contact offense against a child.  *See Worley,* 685 F.3d at 408. Furthermore, this provision is even broader than would be necessary to protect against a contact offense, as it prohibits employment in activities that involve "indirect contact" with children, which would include a nearly endless list of activities where children are not even present. As such, this condition is not reasonably related to the pertinent § 3553(a) factors in this case. This condition severely restricts Mr. Hardin's ability to seek employment.  For instance, this condition could reasonably be interpreted to exclude Mr. Hardin's employment opportunities at restaurants, stores, and any businesses where children may sometimes be present.

This anticipated condition is also unconstitutionally vague.  The phrase "indirect contact with children" does not inform people of ordinary intelligence what employment or

volunteer work is prohibited. Does it mean that Mr. Hardin cannot work in a job where he has contact with a person who then has contact, outside his presence, with a child? Does it mean that he cannot work in a kitchen where he prepares food that might be eaten by a child? Does it mean that he cannot work in a warehouse that ships items to homes where children live? The condition doesn't tell Mr. Hardin what this phrase means, and a probation officer could interpret it to include almost any volunteer or paid job that Mr. Hardin might conceivably obtain. Consequently, the condition is unconstitutionally vague and ought not to be imposed.

Respectfully submitted:

  s/ Peter Adolf
Peter Adolf
Trial Team Leader
Assistant Federal Public Defender
North Carolina Bar No. 37157
Attorney for Timothy Hardin
Federal Public Defender, Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720 (phone)
(704) 374-0722 (fax)
Peter_Adolf@fd.org

DATE: July 14, 2019